FILED
CLERK, U.S. DISTRICT COURT
12/20/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: ____hc____ DEPUTY

LODGED
CLERK, U.S. DISTRICT COURT
12/20/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: ____jb____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America,

v.

Paladin Reed Morgan,

Defendant.

Case No.   2:21-mj-05695 -duty

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of November 30, 2021, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in possession of a firearm and ammunition |

This criminal complaint is based on these facts:

**Please see attached affidavit.**

☒ Continued on the attached sheet.

/S/ Nicole Lozano
*Complainant's signature*

Nicole Lozano, ATF Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: December 20, 2021

*Judge's signature*

City and state: Los Angeles, California

The Hon. Gail J. Standsih
*Printed name and title*

**AFFIDAVIT**

I, Nicole Lozano, being duly sworn, declare and state as follows:

**PURPOSE OF AFFIDAVIT**

1. This affidavit is made in support of a criminal complaint against and warrant to arrest **PALADIN REED MORGAN** ("**MORGAN**") for a violation of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm and ammunition).

2. This affidavit is also made in support of an application for a warrant to search one digital device, specifically a OnePlus cellular phone, model DE2118 with IMEI 990017693900801, currently in the custody of the Los Angeles Police Department, in Los Angeles, California, as described in Attachment A (the "**TARGET DEVICE**").

3. The requested search warrant seeks authorization to search for and seize evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm and ammunition) and 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) (the "Target Offenses"), as described in Attachment B.

4. Attachments A and B are incorporated into this affidavit by reference.

5. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.

6. This affidavit is intended to show only that there is probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.

7. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. Further, all dates and amounts are approximations, and the words "on or about" and "approximately" are omitted for clarity.

## BACKGROUND OF AFFIANT

8. I am a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and have been so employed since November 2012. I am currently assigned to the Los Angeles Group I Field Office. I have received approximately 28 weeks of training at both the Federal Law Enforcement Training Center and the ATF National Academy in Glynco, Georgia, and numerous hours of post-academy training in firearm laws and regulations.

9. As an ATF Special Agent, I primarily enforce federal firearms and explosives laws. I have participated in investigations involving the possession of firearms by prohibited persons, the possession of illegal firearms, and the illegal acquisition of firearms. I have participated in the preparation and execution of search warrants involving various violations of federal and state laws.

10. I have also participated in investigations into drug trafficking and drug trafficking organizations. These

2

investigations involved (1) the unlawful importation, exportation, manufacture, possession with intent to distribute, and distribution of drugs, (2) the laundering of drug proceeds and monetary instruments derived from drug trafficking activities, and (3) conspiracies to traffic controlled substances. I am familiar with the methods drug traffickers use to conceal profits and launder proceeds of narcotics transactions. I am also experienced in the use of tracking devices, conducting surveillance, interviewing witnesses, writing affidavits for and participating in the execution of search warrants, and working with undercover agents, cooperating defendants, and confidential sources.

## SUMMARY OF PROBABLE CAUSE

11.  On November 30, 2021, at the intersection of West 43rd Street and Crenshaw Boulevard in Los Angeles, California, **MORGAN** got into a road rage incident with Victim 1, then removed a firearm with an extended magazine from the trunk of his car and threatened to shoot Victim 1.

12.  Officers responded, and after Victim 1 identified **MORGAN** as the individual who threatened her with a gun, the officers arrested and searched **MORGAN**. During the search, the officers discovered 78.91 grams of methamphetamine, 11.58 grams of marijuana, and the **TARGET DEVICE** on **MORGAN**'s person.

13.  Officers then conducted a search of **MORGAN**'s vehicle, and in the trunk, found a Glock 9mm, Model 17 Gen5 handgun bearing serial number BFKG905, loaded with four rounds of 9mm ammunition in an extended magazine. The firearm and ammunition

had travelled in interstate commerce prior to November 30, 2021, and **MORGAN** had at least 10 felony convictions on his record at the time he possessed the firearm and ammunition.

**STATEMENT OF PROBABLE CAUSE**

14. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A. MORGAN's Criminal History**

15. On December 2, 2021, I reviewed **MORGAN**'s criminal history, as reflected on his National Crime Information Center report, and found that **MORGAN** has following convictions,[1] all for crimes for which the maximum punishment is greater than one year in prison:

a. April 20, 1983, possession of marijuana for sale, in violation of California Health and Safety Code § 11359, in the Superior Court for the State of California, County of Los Angeles, Case Number A387017, and sentenced to probation.

b. October 19, 1988, possession or purchase of cocaine base for sale, in violation of California Health and Safety Code § 11351.5, in the Superior Court for the State of California, County of Los Angeles, Case Number A975057, and sentenced to three years in prison.

c. January 13, 1989, prison escape without force, in violation of California Penal Code § 4530(B), in the Superior Court for the State of California, County of Los Angeles, Case Number A953274, and sentenced to two years in prison.

---

[1] The dates in this paragraph are those of sentencing.

4

   d. August 6, 1991, second-degree burglary, in violation of California Penal Code § 459, in the Superior Court for the State of California, County of Los Angeles, Case Number BA038748, and sentenced to probation.

   e. October 24, 1991, possession of drugs, alcohol, etc. in prison or jail, in violation of California Penal Code § 4573.6, in the Superior Court for the State of California, County of Los Angeles, Case Number BA045275, and sentenced to 60 days in jail and probation.

   f. July 14, 1995, petty theft without a prior, in violation of California Penal Code § 666, in the Superior Court for the State of California, County of Los Angeles, Case Number BA115907, and sentenced to 16 months prison.

   g. July 24, 1996, transporting or selling narcotics or controlled substances, in violation of California Health and Safety Code § 11352(A), in the Superior Court for the State of California, County of Los Angeles, Case Number BA132794, and sentenced to three years prison.

   h. July 26, 2000, possession of cocaine base for sale, in violation of California Health and Safety Code § 11351.5, in the Superior Court for the State of California, County of Los Angeles, Case Number BA197944, and sentenced to five years in prison.

   i. December 19, 2003, possession of a narcotic controlled substance with a prior, in violation of California Health and Safety Code § 11350, in the Superior Court for the

State of California, County of Los Angeles, Case Number BA239781, and sentenced to four years in prison.

j.  May 3, 2006, possession or purchase of cocaine base for sale, in violation of California Penal Code § 12021(A)(1), in the Superior Court for the State of California, County of Los Angeles, Case Number BA295612, and sentenced to three years prison.

k.  November 3, 2008, possession of cocaine base for sale, in violation of California Health and Safety Code § 11351.5, in the Superior Court for the State of California, County of Los Angeles, Case Number YA071569, and sentenced to six years prison.

l.  November 30, 2010, possession of drugs, alcohol, etc. in prison or jail, in violation of California Penal Code § 4573.8, in the Superior Court for the State of California, County of San Bernardino, Case Number FCH1000560, and sentenced to 16 months prison.

m.  October 2, 2012, possession of cocaine base for sale, in violation of California Health and Safety Code § 11351.5, in the Superior Court for the State of California, County of Los Angeles, Case Number BA40141501, and sentenced to 120 days in jail and three years of probation.

n.  February 24, 2016, possession of cocaine base for sale, in violation of California Health and Safety Code § 11351.5, in the Superior Court for the State of California, County of Los Angeles, Case Number BA44295301, and sentenced to two days in jail and probation.

**B.  Officers find MORGAN in possession of a firearm, ammunition, methamphetamine, and marijuana following a road rage incident**

16.  On November 30, 2021, I spoke with Los Angeles Police Department ("LAPD") Officers Gallagher and Halcromb, who that night, with the assistance of other LAPD officers, arrested **MORGAN** for assault with a deadly weapon and illegally possessing a firearm, ammunition, and controlled substances. The arresting officers, along with other law enforcement personnel involved in the apprehension of **MORGAN**, provided the following information, which corroborates the information I have reviewed in the relevant police reports.

17.  On November 30, 2021, at approximately 1:15 p.m., Officers Gallagher and Halcromb received a call from dispatch regarding an approximately 50-year old African American male suspect, who was 5'7" and approximately 150 pounds, wearing plaid pajamas and driving a silver Mercedes S550 bearing license plate number 7TFT416, and who was in the parking lot of the 7-Eleven convenience store at the intersection of West 43rd Street and Crenshaw Boulevard in Los Angeles, California. According to dispatch, the suspect had brandished a firearm on Victim 1.

18.  LAPD Officer Roberson then arrived at the scene, where he immediately encountered a woman, who he believed to Victim 1, and who identified **MORGAN** as the man who brandished the firearm. At the time, **MORGAN** was in a silver Mercedes S550 bearing plate number 7TFT416 (the "Mercedes") in the 7-Eleven parking lot across the street. When Officer Roberson arrived, **MORGAN** got out of the Mercedes and spontaneously shouted to Officer Roberson

that he had gotten into a dispute with a woman. Officer Roberson observed that **MORGAN** was wearing plaid pajamas when he got out of the Mercedes, consistent with the description of the gun-brandishing suspect.

19. Moments later, Officers Halcromb and Gallagher arrived at the scene and were also flagged down by Victim 1, who was near the McDonalds located at the same intersection. Victim 1 then identified **MORGAN** as the individual who threatened her, and pointed to **MORGAN**, who matched the description that dispatch provided of the gun-brandishing suspect, and who by this time was outside of and standing next to the Mercedes.[2]

20. Victim 1 explained that Victim 1 and **MORGAN** were separately driving in the McDonald's parking lot when they obstructed each other, leading to a road rage incident and a verbal altercation between Victim 1 and **MORGAN**.

21. Victim 1 further stated to the officers that during the verbal altercation, **MORGAN** got out of the Mercedes, retrieved a firearm from the trunk of the car, walked toward Victim 1 with the firearm at his side and the muzzle pointed downward, and said something to the effect of "bitch I'll shoot you." Victim 1 walked away, and saw **MORGAN** return to the Mercedes and place the firearm in the trunk of the car. Victim 1 then called 911.

---

[2] The police report states that **MORGAN**, an African American male, is 5'9", weighs 160 pounds, and was born in 1960. Moreover, video surveillance footage from the 7-Eleven parking lot shows **MORGAN** going into the trunk of the Mercedes and driving the Mercedes before officers arrived (as depicted below).

22. Victim 1 described **MORGAN**'s firearm as having a long object protruding from the handle, consistent with the firearm being loaded with an extended magazine.

23. Victim 1 stated that she had never met **MORGAN** before the incident.

24. After Victim 1 identified **MORGAN** as the individual who threatened her with a firearm, LAPD Officer Kang placed **MORGAN** under arrest. Incident to arrest, Officer King removed a bulky object from **MORGAN**'s person, and discovered that the object was a plastic bag containing a large quantity of a crystal substance resembling methamphetamine, four small individually-wrapped bags containing suspected methamphetamine, and two small bags containing a green leafy substance resembling marijuana. No weapons were found on **MORGAN**'s person.

25. The officers then conducted a search of **MORGAN**'s vehicle and discovered, in the trunk of the Mercedes, a Glock 9mm, Model 17 Gen5 handgun bearing serial number BFKG905, loaded with four rounds of 9mm ammunition. The firearm was equipped with an extended magazine, and one round of ammunition was

loaded in the chamber of the firearm. The firearm in the trunk of **MORGAN**'s Mercedes appeared as follows:

 

26. The methamphetamine Officer King found on **MORGAN**'s person weighed approximately 78.91 grams (measured in gross weight). Based on training and experience, I believe that this quantity of methamphetamine is consistent with an intent to distribute the methamphetamine.

27. The marijuana Officer King found on **MORGAN**'s person weighed approximately 11.58 grams (measured in gross weight).

28. From **MORGAN** pant pocket, Officer King seized the **TARGET DEVICE**.

C. **Interstate nexus**

29. On December 1, 2021, ATF Special Agent Lamphere, who is a certified ATF interstate nexus examiner, examined photographs of the firearm and ammunition seized from the trunk of **MORGAN**'s trunk.

30. Special Agent Lamphere confirmed that the firearm and ammunition were manufactured outside of California, and

therefore travelled in interstate commerce prior to **MORGAN**'s possession of the firearm and ammunition on November 30, 2021.

    **D.**    **Review of parking surveillance footage**

    31.    Following **MORGAN**'s arrest, I reviewed surveillance footage from the 7-Eleven parking lot, and observed **MORGAN** and Victim 1 continue their dispute, **MORGAN** return to the trunk of his Mercedes and remove a Glock-style handgun, and **MORGAN** walk with the handgun in the direction of Victim 1, as follows:



**TRAINING AND EXPERIENCE ON FIREARMS OFFENSES**

    32.    From my training, experience, and the collective experiences related to me by other law enforcement officers who conduct firearms investigations, I am aware of the following:

        a.    Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible and under their physical control, such as in their digital devices. It has been my

experience that prohibited individuals who own firearms often keep the contact information of their firearm suppliers for future purchases or referrals, often on digital devices.

      b.   Many people also keep mementos of their firearms, including photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

      c.   Those who illegally possess firearms often sell and purchase firearms. Correspondences between persons buying and selling firearms often occurs via phone calls, email, text message, and social media message to and from smartphones, laptops, or other digital devices. These communications include sending photographs of the firearms between the sellers and buyers, as well as the negotiation of price.

### **TRAINING AND EXPERIENCE ON DRUG TRAFFICKING**

33.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

      a.   Drug trafficking is a business that involves numerous coconspirators, from lower level dealers to higher level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with coconspirators, conduct drug transactions, and transport drugs or drug proceeds.

b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c. Because drug traffickers usually continue to sell drugs to support themselves until they are arrested, their communications with various coconspirators tend to be ongoing until their arrest. Communications between people buying and selling drugs take place by telephone calls and messages, such as email, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photographs or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photographs and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photographs to each other and others to boast about the drugs or facilitate drug sales. It is also common for drug traffickers to carry cell phones in order to remain in contact with drug suppliers or customers, to communicate with coconspirators to facilitate drug trafficking, to coordinate the movements of the trafficker and various coconspirators, and to coordinate the amount of drugs trafficked, as well as payment amounts and methods. Based on my

training and experience, I know that the above-described information can be stored on digital devices carried by drug traffickers.

        d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data, such as Global Positioning System ("GPS") information, other locational information, and identifying information about the trafficker and coconspirators and the location of previous drug transactions or stash houses, and/or the identity or whereabouts of traffickers and coconspirators involved in narcotics trafficking.

        e.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers. These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

        f.    In the case of drug couriers, cell phones or digital devices are also commonly used to communicate itineraries to couriers and provide directions to couriers along their route and once they arrive at their destination.

      g.    To that end, I know that drug traffickers and drug couriers use cell phones to further various aspects of the drug trade. Drug traffickers and drug couriers use cell phones to contact (by way of both voice call and electronic message) drug suppliers, customers, and coconspirators, all for the purpose of acquiring, storing, transporting, and distributing drugs. Drug traffickers also maintain, on their cell phones, records related to drug distribution (e.g., ledgers and notes pertaining to drug sales), and photographs of drugs, drug paraphernalia, and the instruments of the drug trade (including firearms). Further, the location data associated with a drug trafficker's cell phones (which is often stored locally on cell phones) assists investigators in identifying the drug trafficker's residence, stash house, coconspirators, the residences of the trafficker's coconspirators, and meeting locations.

### **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

34.    As used in this affidavit, the term "digital device" includes the **TARGET DEVICE**.

35.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained

15

in the file does not disappear, rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files, recently used tasks and processes, online nicknames and passwords in the form of configuration data stored by browser, email, and chat programs, attachment of other devices, times the device was in use, and file creation dates and sequence.

    c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    36.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

        a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

        b.    Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photographs with an average size of 1.5MB.

    37.    The search warrant requests authorization to use the biometric unlock features of a device, based on the following,

which I know from my training, experience, and review of publicly available materials:

    a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

    b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

    c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress **MORGAN**'s thumb and/or fingers on the

18

device, and (2) hold the device in front of **MORGAN**'s face with his eyes open to activate the facial, iris, and/or retina recognition feature.

38. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## CONCLUSION

39. For the foregoing reasons, there is probable cause to issue the requested complaint, arrest warrant, and search warrant.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __20__ day of
__December__, 2021.

_____
THE HONORABLE Gail J. Standish
UNITED STATES MAGISTRATE JUDGE